UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| PAUL WILSON,<br><br>    Plaintiff,<br><br>    v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security<br>Administration,<br><br>    Defendant. | CIVIL ACTION<br>NO. 12-40162-TSH |

**MEMORANDUM OF DECISION ON PLAINTIFF'S MOTION FOR ORDER REVERSING DECISION OF COMMISSIONER (Docket No. 14) AND DEFENDANT'S MOTION FOR ORDER AFFIRMING DECISION OF COMMISSIONER (Docket No. 20)**
**January 22, 2014**

HILLMAN, D.J.

This is an action for judicial review of a final decision by the Commissioner of the Social Security Administration (the "Commissioner") denying Paul Wilson's ("Plaintiff") application for Social Security Disability Insurance benefits ("DIB") and Supplemental Security Income ("SSI"). Plaintiff filed a motion seeking an order reversing the decision of the Commissioner (Docket No. 14), and the Commissioner filed a cross-motion seeking an order affirming the decision of the Commissioner (Docket No. 20). For the reasons stated below, Plaintiff's motion is denied, and the Commissioner's motion is granted.

<u>Procedural History</u>

Plaintiff filed an application for DIB and SSI in March 2009 claiming he had been

disabled since September 1, 2004, the alleged onset date ("AOD"). (R. 188).[1] Plaintiff claimed he could not work due to lower back and breathing problems as well as numbness in both legs. (R. 200). Plaintiff's claim was denied initially in July 2009, and then again upon reconsideration in February 2010. (R. 74-77). On March 4, 2010 Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (R. 118). An ALJ held a hearing on March 30, 2011 where a vocational expert ("VE") testified. (R. 13-73). On July 15, 2011 the ALJ issued a decision finding Plaintiff was not disabled under the Social Security Act. (R. 81-94). The Appeals Council denied Plaintiff's request for review on October 15, 2012, making the ALJ's decision the final decision of the Commissioner. (R. 100-102).

## Facts

### Personal and Employment History

Plaintiff was 38 years old on his AOD. (R. 188). His highest grade of school completed was eighth grade. (R. 204). Before his AOD, Plaintiff worked as a maintenance supervisor in a nursing home, which involved supervising six people as well as completing other tasks. (R. 201).

### Medical History

1. Test Results

On August 29, 2007 x-rays were taken of Plaintiff's chest and lumbar back. The chest x-ray showed no acute pulmonary disease and no abnormalities. The back x-ray showed mild degenerative disc and joint disease of the lumbar spine. (R. 310, 312, 384).

An x-ray of Plaintiff's chest taken on April 3, 2009 revealed increased inflation in the lungs that was consistent with a diagnosis of Chronic Obstructive Pulmonary Disease ("COPD"). (R. 303, 325, 380, 382-83, 389). The x-ray showed no other abnormalities. (R. 303, 325, 380,

---

[1] A copy of the Administrative Record ("R.") has been provided to the Court under seal (Docket No. 11).

382-83, 389).  A third chest x-ray taken December 24, 2009 showed no acute disease.  (R. 460).

Dr. Patricia cross found an MRI of Plaintiff's lumbar back taken April 9, 2009 showed the following: (1) multilevel lumbar spondylosis, shallow broad disc protrusion L5-S1, no central canal stenosis, and bilateral mild foraminal stenosis secondary to hypertrophic changes; (2) mild bilateral foraminal stenosis L4-L5 secondary to hypertrophic changes; and (3) shallow central and right paramedian disc protrusion L3-L4, no central canal or foraminal stenosis, shallow broad-based central disc protrusion L2-L3, and no central canal or foraminal stenosis.  (R. 289-90, 327, 379, 395).

2.  Family Physician and Emergency Care

Plaintiff first saw Dr. E. Charmaine Pastrano, a family physician, in February 2009.  (R. 318, 367).  Dr. Pastrano's report from this initial visit notes that Plaintiff has had COPD for 25 years and has had low back pain for more than 25 years.  (R. 367).  Plaintiff's lungs were clear.  (R. 367).  When she examined his back, Dr. Pastrano found Plaintiff had positive tenderness on deep palpation at the sacroiliac joints, good flexion, good extension, good side-to-side bending, negative straight leg raising, and no sensory deficits.  (R. 367).  Dr. Pastrano noted that Plaintiff had reduced his smoking from one pack a day to one pack every three days, but that he refused her offer to help him quit, saying he would continue to wean himself.  (R. 367).  Dr. Pastrano planned to send Plaintiff to physical therapy for his back pain and, if there was no improvement, to order an MRI.  (R. 367).  On March 20, 2009 Dr. Pastrano saw Plaintiff again and planned to send him to see a pulmonologist for his COPD and to have an MRI for his back.  (R. 366).

During a visit on April 17, 2009 Dr. Pastrano noted that Plaintiff continued to have a significant amount of back pain.  (R. 358).  Plaintiff reported he could walk for 15 to 20 minutes but afterwards needed to rest, and could still do some chores but had to bend over more and more

often to relieve pain. (R. 358). During his examination Plaintiff had poor flexion and extension, significant pain, and positive straight leg raising on the left side only. (R. 358). Dr. Pastrano prescribed Vicodin for back pain and planned to refer Plaintiff to the Spine Center for further evaluation and treatment. (R. 358). Dr. Pastrano also highly recommended that Plaintiff quit smoking. (R. 358). When Plaintiff saw Dr. Pastrano again on May 15, 2009 he had good flexion and extension in his back, positive straight leg raising on the right and no sensory deficits. (R. 357). Plaintiff had not been using the Vicodin as much. (R. 357).

On August 5, 2009 Dr. Pastrano advised Plaintiff to continue walking exercises as tolerated. (R. 345). They discussed his quitting smoking, Plaintiff said he was weaning off tobacco due to the high price of cigarettes. (R. 345). Dr. Pastrano described Plaintiff's COPD as stable. (R. 346).

On December 7, 2009 Plaintiff visited Dr. Pastrano complaining of worsening back pain and numbness in his right leg and foot and left foot after 30 minutes of walking. (R. 452). Plaintiff reported the activities of daily living were becoming burdensome due to the back pain. (R. 438). Dr. Pastrano examined Plaintiff's back and found he had good flexion but very limited extension and limited side to side bending. (R. 452). Dr. Pastrano recommended he continue seeing the chiropractor and call another doctor for a possible steroid injection. (R. 452).

On December 24, 2009 Plaintiff went to the emergency room complaining of sharp left-sided chest pain. (R. 456). Plaintiff reported smoking one pack of cigarettes per day and declined educational materials on smoking cessation. (R. 457). Lab results were normal, vital signs were stable, and Plaintiff's pain improved over a two hour period. (R. 458).

On August 12, 2010 Dr. Pastrano examined Plaintiff and found there continued to be limited flexion and extension and limited side to side bending, as well as positive straight leg

raising on the right. (R. 511, 529). Strength was 5/5. (R. 511, 529). Plaintiff continued to complain of back pain. (R. 511, 529). On October 27, 2010 Plaintiff reported that while he continued to have back pain, the physical therapy did provide some relief. (R. 509, 527). Plaintiff was smoking a pack of cigarettes a day and Dr. Pastrano again discussed quitting smoking with Plaintiff. (R. 509, 527). On December 2, 2010 Plaintiff complained of shortness of breath. (R. 507). Dr. Pastrano reviewed his vital signs and found his blood pressure was excellent, no heart murmurs were appreciated and his lungs were clear to auscultation bilaterally. (R. 507). On January 11, 2012 Dr. Pastrano noted that Plaintiff suffers from chronic back pain and radicular pain in both lower extremities, and that in November she had started him on Gabapentin which had helped control his radicular symptoms. (R. 568).

Dr. Pastrano gave several opinions on Plaintiff's functional abilities. On July 1, 2009 she explained that due to the physical limitations of Plaintiff's diagnosis of lumbar spinal stenosis L2-21, she feared his current employment could be a detriment and recommended he continue on disability for 12 months. (R. 399). On August 5, 2009 Dr. Pastrano reiterated that opinion. (R. 337, 360). She also stated that Plaintiff's COPD and asthma were well controlled on his medications. (R. 337, 360). On August 10, 2010 Dr. Pastrano opined that Plaintiff was totally disabled. (R. 482).

Dr. Pastrano also completed two multiple impairment questionnaires, the first in April 2010 and the second in March 2011. (R. 473-80, 515-22). In April 2010 Dr. Pastrano identified Plaintiff's limited back flexion and extension, MRI results, back pain, and decreased motor function and sensation in his lower extremities as support for her diagnosis of lumbar spondylosis and bilateral foraminal stenosis. (R. 473-74). She noted that Plaintiff had daily pain in the lower back radiating to his lower legs that was precipitated by prolonged standing, sitting,

or bending forward. (R. 475). Dr. Pastrano estimated that Plaintiff's pain rated between nine and ten out of ten. (R. 475). She opined that Plaintiff could sit for one hour in an eight-hour day, could stand or walk for up to one hour in an eight-hour day, and would need to get up and move around for 10 to 15 minutes every 30 minutes. (R. 475-76). She opined that Plaintiff could lift and carry up to 10 pounds frequently and up to 20 pounds occasionally, and that Plaintiff did not have limitations in reaching, handling, fingering, or lifting. (R. 476). Dr. Pastrano believed that Plaintiff's pain constantly interfered with his attention and concentration and that he would have to take unscheduled rest breaks of 15 minutes every hour. (R. 478). She opined that Plaintiff would be absent from work more than three times per month due to his impairment or treatment. (R. 479). She stated that he needed to avoid heights and could do no pushing, pulling, kneeling, bending, or stooping. (R. 479). She wrote that Plaintiff's symptoms and limitations date back to 2005. (R. 479).

In March 2011 Dr. Pastrano gave essentially the same opinions in another multiple impairment questionnaire, though in this second questionnaire she opined that Plaintiff could sit for one to two hours in and eight-hour work day and stand or walk for one hour. (R. 517). She also noted that Plaintiff had minimal to moderate relief on narcotics but declined continuing them due to the possibility of becoming addicted. (R. 519).

   3. Chiropractic Care and Physical Therapy

Plaintiff saw Dr. Matthew DeLisle, a chiropractic physician, several times beginning in April 2006 for complaints of back pain with radiation into the lower extremities. (R. 369-71). In October 2007 and June 2008 Dr. DeLisle wrote letters regarding his treatment of Plaintiff. (R. 369-71). Dr. DeLisle explained that his examination findings were consistent with the diagnosis of chronic lumbar spondylosis with radiculitis. (R. 369-71). Dr. DeLisle treated Plaintiff with

manual decompression of the lumbar disc through manipulative release, soft tissue release, and recommendations that Plaintiff stretch the lower back. (R. 369-71). Dr. DeLisle believed Plaintiff was a candidate for additional studies, such as an MRI. (R. 369-71).

Plaintiff had a physical therapy screening in April 2009 where he complained of back pain that was improved by sitting and made worse by standing or walking. (R. 297-98).

4. Specialists

On May 14, 2009 Plaintiff saw Dr. Jason Eck at the request of Dr. Pastrano regarding his back pain. (R. 364-65, 396-97, 484-85, 487-88). Plaintiff told Dr. Eck he could only stand or walk for about 30 minutes without severe exacerbation of the pain, and that the pain improved when he was bent forward either sitting in a chair or bent over a cart. (R. 364, 396, 484, 487). Plaintiff said he had been seeing a chiropractor which provided some help, but had no other treatment to date. (R. 364, 396, 484, 487). Dr. Eck examined Plaintiff and found he walked with a normal gait, had 5/5 strength throughout his lower extremities, had sensation to all extremities, and that his straight leg raise was positive on the right, but negative on the left. (R. 364, 396, 484, 487). Dr. Eck reviewed Plaintiff's MRI and saw some diffuse degenerative changes from L2 down through S1 with some central and foraminal stenosis. (R. 364, 396, 484, 487). Dr. Eck concluded Plaintiff had lumbar spinal stenosis and recommended an epidural steroid injection, which Plaintiff had not yet tried. (R. 364-65, 396-97, 484-85, 487-88). He stated that most of Plaintiff's pain is radicular in origin. (R. 365, 397, 485, 488). Dr. Eck was hopeful that the epidural would help and stated that as long as Plaintiff did well with conservative management, he would like to continue along that path. (R. 365, 397, 485, 488). Dr. Eck did discuss the possibility of surgery with Plaintiff, but Plaintiff was not interested. (R. 365, 397, 485, 488). On June 3, 2011 Dr. Eck wrote that he did not discuss the effects of smoking with Plaintiff. (R.

539). He stated that he was hopeful the epidural injection would help Plaintiff's pain and as far as Plaintiff's vocational capacity, Dr. Eck recommended no medical restrictions. (R. 539).

A pulmonologist, Dr. Kimberly Fisher, saw Plaintiff on April 6, 2009 at the request of Dr. Pastrano to further evaluate his COPD and asthma. (R. 283, 322, 342, 361, 390). Plaintiff complained of shortness of breath and dyspnea on exertion, which were worse at night and after activities such as climbing stairs, moving wood, mowing the lawn, or walking at a brisk pace. (R. 283, 322, 342, 361, 390). Dr. Fisher noted that Plaintiff smokes one third of a pack of cigarettes daily and used to smoke a pack a day. (R. 283, 322, 342, 361, 390). She also noted under Plaintiff's "social history" that he was disabled due to back pain. (R. 283, 322, 342, 361, 390). Dr. Fisher examined Plaintiff and looked at an x-ray taken of his chest on April 3, 2009. (R. 284, 323, 343, 362, 391). Dr. Fisher concluded that Plaintiff has either obstructive lung disease and possibly asthma, RADS following his butane exposure, tobacco related COPD, or a combination of all three. (R. 284, 323, 343, 362, 391). Dr. Fisher started Plaintiff on Advair and Combivent. (R. 284, 323, 343, 362, 391). She also spoke to him at length about smoking cessation, and noted that Plaintiff was unwilling to take pharmacological aids due to concerns about side effects, but would work on smoking cessation on his own. (R. 284, 323, 343, 362, 391).

Plaintiff had a follow up appointment with Dr. Emil Tigas, a colleague of Dr. Fisher, on June 11, 2009. (R. 392-93, 495-96). Plaintiff had ceased using Advair after a week or two due to chest congestion, and as a result his asthma remained poorly controlled. (R. 392, 495). Dr. Tigas noted that Plaintiff "unfortunately" continued to smoke one third of a pack of cigarettes per day. (R. 392, 495). Dr. Tigas examined Plaintiff and Plaintiff's laboratory data and found significant airway obstruction on spirometry with significant most-bronchodilator improvement,

8

which was suggestive of asthma. (R. 392, 495). Dr. Tigas talked to Plaintiff about the importance of medications for asthma and convinced him to try using Advair again. (R. 392, 495).

   5. State Agency Findings

On July 16, 2009 Dr. S. Ram Upadhyay, a state agency non-examining physician, completed a Physical Residual Functional Capacity Assessment in Plaintiff's case. (R. 329-336). Dr. Upadhyay opined that Plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently, could stand and/or walk, with normal breaks, for 2 hours in an 8-hour workday, could sit, with normal breaks, for 6 hours in an 8-hour workday, and was unlimited in his ability to push and/or pull. (R. 330). Dr. Upadhyay further opined that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl. (R. 331). He found that Plaintiff should avoid concentrated exposure to extreme cold, fumes, odors, dusts, gases, poor ventilation, and hazards such as machinery and heights. (R. 333).

Another state medical consultant, Dr. Meghana Karanda, completed a Physical Residual Functional Capacity Assessment for Plaintiff on January 29, 2010. (R. 463-470). Dr. Karanda's opinions mirror those of Dr. Upadhyay, except that Dr. Karanda did include the limitation that Plaintiff should avoid concentrated exposure to hazards such as machinery and heights. (R. 463-470).

*Hearing Testimony*

At his hearing before the ALJ, Plaintiff testified that he had not worked or looked for work since 2004 and was seeking disability benefits because of numbness in both of his legs and lower back and breathing problems. (R. 21-22). Plaintiff said he mowed the lawn using a riding mower in fall 2010 and occasionally moved wood. (R. 20-21). He said that he never had

surgery or the epidural shots recommended by Dr. Eck because his insurance ran out, but testified that he currently has insurance. (R. 22, 38). Plaintiff testified that he did not use any type of assistive device to move about and went up the stairs at his home unassisted every day. (R. 23-24). Plaintiff explained that he could not work full time, even in a job that would allow him to sit whenever he wanted, because he cannot sit or stand for long before he needs to lay down. (R. 24-26). Plaintiff reported that he only take Tylenol for his back pain, because he prefers not to take the prescription pain killers. (R. 26-27). Plaintiff told the ALJ he has smoked for about 25 years, had been told by more than five doctors to quit, and was trying to quit but continued to smoke. (R. 28-30). Plaintiff said Dr. Pastrano had advised him that smoking harmed his breathing ability, but had never discussed it affecting his back. (R. 29). Plaintiff told the ALJ that neither the physical therapy nor the chiropractic care helped his back. (R. 38-39).

The ALJ asked the VE about the jobs available to a person with Plaintiff's work background and who could perform light work that would require a sit/stand option at his discretion with no exposure to gas, dust, fumes, or smoke. (R. 51). The VE responded that such an individual could work as an information clerk, inspector, or security guard. (R. 51). She testified that the numbers for those are: information clerk, 2, 000 in Massachusetts and 250,000 nationally; security guard desk attendant, 2,000 in Massachusetts and 250,000 nationally; and inspector, 2,000 in Massachusetts and 300,000 nationally. (R. 51-52). The VE later testified that the security guard job actually would not be appropriate for the person described by the ALJ because that job would not allow sitting and standing at the employee's discretion. (R. 57-58).

*The ALJ's Findings*

To be found eligible for DIB and SSI, an applicant must prove that she is unable "to

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423 (d)(1)(A). When determining whether an applicant meets this standard, the Commissioner uses a "five-step sequential evaluation process." 20 C.F.R. § 404.1520 (a)(4). This process requires the Commissioner to decide (1) whether the applicant is engaged is substantial gainful activity; if not (2) whether the applicant has a severe medical impairment; if so (3) whether the impairment meets or equals one of the listings in the Listing of Impairments, 20 C.F.R. § 404, subpart P, Appendix 1; if not (4) whether the applicants Residual Functional Capacity ("RFC") allows her to perform her past relevant work; and, if not (5) whether, considering the applicant's RFC, age, education, and work experience, the applicant could make an adjustment to other work. *Id*. Any jobs that an applicant could adjust to must exist in significant numbers in the national economy. 20 C.F.R. § 404.1560.

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the AOD. (R. 83). At step two, the ALJ found Plaintiff had the following severe impairments: degenerative disease of the lumbo-sacral spine and chronic obstructive respiratory disease. (R. 83). At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P. (R. 91). He found that Plaintiff had the RFC to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that we would require the opportunity to alternative his position between sitting and standing at his discretion, and could not be exposed to gas, dust, fumes, or smoke. (R. 91). At step four, the ALJ found Plaintiff was unable to perform any past relevant work. (R. 92). The ALJ found the Plaintiff was 38 years old on the

11

AOD, which is defined as a younger individual, has a limited education, could communicate in English, and had acquired work skills from past relevant work. (R. 92). In light of these factors and Plaintiff's RFC, tat step five the ALJ found Plaintiff could perform jobs that exist in significant numbers in the national economy, and therefore was note disabled from the AOD through the alleged onset date. (R. 92-93).

In making this decision, the ALJ found Plaintiff's allegations of disability not fully credible because his actions were inconsistent with his allegations, he failed to adhere to medical advice, and his testimony was inconsistent with his actions. (R. 87-88). Specifically, the ALJ noted that Plaintiff had recently mowed the lawn and used no assistive device, that Plaintiff had been told by at least five doctors to quit smoking but had not, and that Plaintiff said he was trying to quit but acted otherwise. (R. 87-88). The ALJ gave only slight weight to Dr. Pastrano's opinion on Plaintiff's vocational capacity because it was inconsistent with the other substantial weight on the record and because she failed to give adequate weight to Plaintiff's failure to follow medical advice. (R. 90). The ALJ gave substantial weight to the opinion of Dr. Eck as he was an examining physician and a specialist. (R. 90-91). The ALJ gave no weight to Dr. Fisher's opinion that claimant is disabled due to back pain as Dr. Fisher has no expertise in spinal impairments, her one examination concerned only Plaintiff's respiratory issues, and this statement appeared to be based entirely on Plaintiff's report to her, not an independent evaluation. (R. 91). The ALJ gave substantial weight to the opinions of the state evaluator regarding the limitations on Plaintiff's ability to work. (R. 91).

## Discussion

Plaintiff argues the Commissioners' decision should be reversed because the ALJ erred in failing to consider Plaintiff's subjective complaints and thus the RFC was flawed, the ALJ failed

to properly evaluate the medical evidence, and the ALJ failed to meet his burden on proof at step five of the evaluation.

*Standard of Review*

Review by this Court is limited to whether the Commissioner's findings are supported by substantial evidence and whether he applied the correct legal standards. *Manso-Pizarro v. Sec'y of Heath & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996); *see also Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). When applying the substantial evidence standard, the court must bear in mind that it is the province of the Commissioner to determine issues of credibility, draw inferences from the record evidence, and resolve conflicts about the evidence. *Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991). Reversal of an ALJ's decision by this court is warranted only if the ALJ made a legal error in deciding the claim, or if the record contains no "evidence rationally adequate . . . to justify the conclusion" of the ALJ. *Roman-Roman v. Comm'r of Social Security*, 114 F. App'x 410, 411 (1st Cir. 2004); *see also Manso-Pizzaro*, 76 F.3d at 16. If the Commissioner's decision is supported by substantial evidence, it must be upheld even if the record could arguably support a different conclusion. *Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 144 (1st Cir. 1987).

*Whether the ALJ Properly Considered Plaintiff's Subjective Complaints*

Plaintiff claims the ALJ failed to properly assess his credibility, and thus did not adequately consider his subjective complaints of pain. To support this claim, Plaintiff argues that the ALJ's determination that Plaintiff lacked credibility was not based on substantial evidence because: (1) the ALJ improperly found Plaintiff's complaints of pain were not supported by the

13

medical record; (2) the ALJ incorrectly asserted that Plaintiff took actions inconsistent with his allegations of pain; (3) the ALJ improperly determined Plaintiff failed to follow medical advice; and (4) the ALJ improperly discounted Plaintiff's credibility based on an alleged material inconsistency in Plaintiff's testimony.

When a claimant's statements about subjective pain are "not inconsistent with the objective findings, they could, if found credible by the adjudicator, permit a finding of disability where medical findings alone would not" and should be part of the calculus. *Avery v. Secretary of Health and Human Services*, 797 F.2d 19, 21 (1st Cir. 1986). When pain is a significant factor in a claimant's alleged inability to work, and the allegation is not supported by objective findings, the ALJ should "investigate all avenues presented that relate to subjective complaints." *Avery*, 797 F.2d at 28-29.[2] Here, pain is a significant factor in Plaintiff's alleged inability to work; it is due to pain that he claims he cannot even sit for very long before he needs to lie down. The ALJ found that Plaintiff's medically determinable impairments could reasonable cause the alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not substantiated by objective medical evidence and were not credible to the extent they conflicted with the RFC.

Plaintiff argues that his complaints of pain were consistent with the medical record. The ALJ noted that Dr. Eck, whose opinion the ALJ according great weight, opined that Plaintiff had no vocational limitations. The state agency physicians who reviewed Plaintiff's medical record also did not find Plaintiff was limited to the extent Plaintiff claimed to be. These opinions provide substantial support for the ALJ's determination that the intensity, persistence, and

---

[2] Some of the factors to be considered, if relevant, are: (1) the nature, location, onset, duration, frequency, radiation, and intensity of any pain; (2) precipitating and aggravating factors (e.g., movement, activity, environmental conditions); (3) type, dosage, effectiveness, and adverse side-effects of any pain medication; (4) treatment, other than medication, for relief of pain; (5) functional restrictions; and (6) the claimant's daily activities. *Avery*, 797 F.2d at 28-29; see also SSR 96-7P, 1996 WL 374186, *3.

limiting effects of Plaintiff's alleged symptoms were inconsistent with the medical record. Only Dr. Pastrano's opinion supports Plaintiff's allegations regarding pain, and even her reports contain nothing about Plaintiff needing to lie down. However, the ALJ according Dr. Pastrano's opinion only slight weight, so it is not enough to overcome the substantial support for the ALJ's finding.

The ALJ noted in his decision that the fact that Plaintiff recently mowed the lawn using a riding mower, moved wood, and did not use an assistive device for walking were inconsistent with his alleged level of pain. In his testimony, Plaintiff did admit to recently mowing the lawn on a riding mower, said he does not use an assistive device for walking, and explained that he had carried light loads of wood in 2009, though infrequently. Plaintiff argues that the ALJ's decision showed a flawed understanding of the evidence. However, it is the province of the ALJ, not this Court, to draw inferences from the evidence and make determinations of credibility. The ALJ's understanding of the evidence has enough supported in the record that it is not unreasonable. This was not the only reason the ALJ discounted Plaintiff's complaints of pain; he also found Plaintiff's testimony not credible because Plaintiff ignored medical advice and because of material inconsistencies in Plaintiff's testimony.

Plaintiff argues that the ALJ improperly discounted the Plaintiff's testimony because he allegedly failed to adhere to medical advice. Under SSR 96-7P, an individual's statements may be considered less credible if the level or frequency of the treatment is inconsistent with the level of complaints, or if the records show that the individual is not following the treatment that there is not good reason for the failure. SSR 96-7P, 1996 WL 374186, *7. Here, the ALJ noted that Plaintiff had been told by at least five doctors to quit smoking, but that Plaintiff failed to do so, and this justified him in viewing Plaintiff's back and respiratory impairments with skepticism.

15

While the ALJ properly considered Plaintiff's failure to quit smoking as it related to Plaintiff's COPD, nothing on the record suggests Plaintiff was ever told his smoking affected his back, nor is there anything on the record that suggests Plaintiff's back pain would be remedied if he had quit smoking.[3] The cases cited by the ALJ do not support his contention that Plaintiff's failure to quit smoking supports the ALJ in viewing Plaintiff's back pain with skepticism. In *Hall-Thulin v. Comm'r of Soc. Sec.*, the claimant had a two-year delay in following her physician's advice to quit smoking, and the Court noted that the ALJ could consider this.  110 F.3d 64 (6th Cir. 1997) In that case, the alleged disability was based on problems with the claimant's vocal chords and difficult breathing, ailments which could be improved by the cessation of smoking. *Id.* (citing 20 C.F.R. § 404.1530(a), which states "[i]n order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work.").  Similarly, in *Floyd v. Astrue*, the claimant ignored several medical professionals' instructions to exercise, eat a proper diet, and quit smoking although those professionals told claimant doing those things were key to claimant's physical recovery. 2011 WL 1532534, *7 (E.D. TN, 2011).  Here, there is no evidence quitting smoking would improve Plaintiff's back pain and restore his ability to work, or that any medical professional told Plaintiff that would be the case. Therefore, the ALJ improperly considered Plaintiff's failure to quit smoking as cause to discount Plaintiff's back impairment. However, the Court finds this error harmless, as the ALJ's determination of Plaintiff's credibility is adequately supported without this reason. *See Garza v. Astrue*, 380 F. App'x 672, 673 (9th Cir. 2010) (finding one of ALJ's reasons for rejecting credibility of testimony about pain support by evidence, thus any error with regard to the other three reasons was harmless.).

---

[3] The ALJ spent some time questioning the Plaintiff on this point, and the Plaintiff repeatedly stated that no doctor had ever told him that smoking affected his back pain.

The ALJ also found claimant not fully credible because of a material inconsistency in Plaintiff's testimony, specifically that Plaintiff testified several times that he was trying to stop smoking and that ALJ believed these statements to be "outright falsehoods." The ALJ based this determination on his findings that the record shows Plaintiff: (1) consistently expressed a lack of interest in stopping smoking; (2) has refused information regarding smoking cessation; and (3) has refused to use any type of pharmaceutical aid to assist him in stopping smoking. The record shows Plaintiff did cutting back from one pack per day to one third of a pack per day, but continued smoking a third of a pack a day throughout the relevant time period. The record also shows Plaintiff refused materials on smoking cessation and pharmaceutical aids, though he did express concern about the side effects for the latter. While perhaps the label "outright falsehoods" was an overstatement, the ALJ's determination that Plaintiff's testimony was inconsistent with his actions is substantially supported by the record and thus properly supports the ALJ's credibility determination.

The ALJ's credibility determination is entitled to deference. *Frustaglia v. Sec'y of Health & Human Servs.*, 829 F.2d 192, 195 (1st Cir. 1987). While the credibility determination here is not perfect, looking at the ALJ's decision as a whole it is supported by substantial evidence, and any errors are harmless; therefore it will not be disturbed by this Court.

*Whether the ALJ Properly Evaluated the Medical Evidence*

Plaintiff argues that the ALJ failed to give the proper weight to the medical professionals in this case, specifically that he gave too much weight to Dr. Eck and the state evaluators and too little weight to Dr. Pastrano. While treating sources are generally given more weight, an ALJ need not accord him controlling weight if the ALJ finds a treating sources opinion is not supported by or inconsistent with the record. 20 C.F.R. 202.1527(c). Moreover, more weight

17

can be given to the opinion of a specialist about medical issues related to his or her specialty. 20 C.F.R. 202.1527(c)(5).

      Here, Dr. Pastrano, Plaintiff's treating physician, opined that Plaintiff could only sit for one hour in an eight-hour day and could stand and walk for even less time. Dr. Eck, on the other hand, determined Plaintiff had no vocational restrictions. The ALJ must give "good reasons" for the weight given to treating sources. 20 C.F.R. 202.1527(c). The ALJ did so in this case. The ALJ explained that gave Dr. Pastrano's opinion less weight because it was inconsistent with other substantial evidence on the record. He noted that Dr. Eck only saw Plaintiff once, so he did not have the longitudinal relationship that Dr. Pastrano had with Plaintiff. However, Dr. Eck is a specialist in spinal impairments and Dr. Pastrano referred Plaintiff to Dr. Eck, suggesting that Dr. Pastrano believed Dr. Eck had greater expertise in this area and could properly care for Plaintiff's back. Dr. Eck, a specialist, both examined the Plaintiff and reviewed the MRI findings before making his conclusions. It was therefore reasonable for the ALJ to give great weight to Dr. Eck's opinion as an examining specialist, and to give less weight to Dr. Pastrano's opinion as it was inconsistent with Dr. Eck's. Dr. Pastrano's opinion was also inconsistent with the reports of the state evaluators, further supporting the ALJ according it less weight.

      The record also supports the ALJ's determination that Dr. Fisher's opinion was entitled to little weight, as her expertise is in pulmonary, not back issues, and her statement regarding Plaintiff's disability has no basis in an examination and appears to be based entirely on Plaintiff's report. The ALJ gave sufficient reasons under 20 C.F.R. 202.1527(c) for the weight accorded to Plaintiff's physician's. These reasons are supported by substantial evidence and thus give no basis for reversing the Commissioner's decision.

*Whether the ALJ Met his Burden of Proof at Step Five*

Finally, Plaintiff argues that the ALJ improperly relied on the VE's testimony because that testimony relied on a hypothetical question based on a flawed RFC. Testimony of a VE must be based on a hypothetical question that includes an RFC that is supported by the medical record. *See Arocho v. Sec'y of Health & Human Servs.*, 670 F.2d 374, 375 (1st Cir. 1982). Plaintiff argues the RFC was flawed essentially for the reasons Plaintiff gives for the reversal of the decision: that the ALJ improperly gave Dr. Pastrano's opinion little weight and did not incorporate Plaintiff's subjective reports or pain, which the ALJ found not credible. As explained above, these determinations by the ALJ are supported by substantial evidence and thus are not adequate grounds for finding the RFC was flawed. As such, reliance on the VE's testimony was not improper, and the ALJ met his burden of proof at step five of the evaluation.

## Conclusion

The ALJ's decision is supported by substantial evidence. Therefore, Plaintiff's Motion for Order Reversing Decision of Commissioner is **denied**, and the Commissioner's Motion for Order Affirming Decision of Commissioner is **granted**.

SO ORDERED.

/s/ *Timothy S. Hillman*
TIMOTHY S. HILLMAN
UNITED STATES DISTRICT JUDGE